UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

DEC 3 1 2014


CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL HEATH THETFORD,<br><br>Defendant. | 3:11-CR-30159-RAL<br><br><br>OPINION AND ORDER DENYING DEFENDANT'S MOTIONS FOR NEW TRIAL |

A jury, after a five-day trial, found Defendant Michael Heath Thetford (Thetford) guilty of charges of Felon in Possession of a Firearm, Impersonating a Federal Officer, Interstate Stalking, and Tampering With a Witness. On November 17, 2014, Thetford filed three separate motions. Through his court-appointed counsel, Thetford sought a new trial arguing newly discovered evidence, based on the United States Court of Appeals for the Eleventh Circuit reinstating Thetford's § 1983 claim challenging conditions of confinement at the Hoover City Jail, where he was confined when awaiting disposition of separate federal charges in the Northern District of Alabama. Doc. 149. Though represented by counsel, Thetford filed pro se a Motion for Judicial Notice of United Nations Treatys [sic], Doc. 151, and Defendants [sic] Pro Se Motion for a New Trial, Doc. 152, asserting various additional arguments. For the reasons explained, Thetford's motions are denied.

## I. Facts

### A. Procedural History

1

Thetford initially was indicted in the District of South Dakota on December 14, 2011. Doc. 4. Thetford however first faced criminal charges in two cases in the United States District Court for the Northern District of Alabama. United States v. Michael Heath Thetford, 11-CR-00495-KOB-HGD and 12-CR-00349-KOB-HGD. During the pendency of the charges in the Northern District of Alabama, Thetford was confined in various facilities, including an extended stay at the Hoover City Jail. Thetford was dissatisfied with two court-appointed Alabama attorneys, discharged those attorneys, and represented himself for part of the time in the proceedings in the Northern District of Alabama. Ultimately, with the assistance of attorney Kevin Butler, the Federal Public Defender for the Northern District of Alabama, Thetford entered into plea agreements to plead guilty to counts of sexual exploitation of children and receipt of child pornography in 12-CR-00349-KOB-HGD, and to counts of felon in possession of a firearm and wire fraud in 11-CR-00495-KOB-HGD in the Northern District of Alabama. Trial Exhibits 152, 153. Those plea agreements were binding under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, contemplating that Thetford would receive a sentence of 318 months total, with time on each of the counts to be served concurrently. Thetford also negotiated a plea agreement to plead guilty to one count in the District of South Dakota and to receive a sentence that would run concurrently with the 318-month sentence received from the Northern District of Alabama. Thetford pleaded guilty in the Northern District of Alabama and received a 318-month sentence, but chose not to plead guilty in South Dakota.

In this Court and on appeal to the Eleventh Circuit, Thetford contended that his plea in the Northern District of Alabama was not voluntary and knowing. The Government in the District of South Dakota then presented additional evidence to a grand jury and obtained a superseding indictment charging Thetford with five counts: (1) Felon in Possession of a

2

Firearm; (2) Impersonating a Federal Officer; (3) Interstate Stalking; (4) and (5) two counts of Tampering With a Witness. Prior to trial, this Court merged the tampering with a witness counts, Doc. 137, so that Thetford faced four charges during the jury trial in the District of South Dakota. That trial occurred from October 20 through October 24, 2014, and the jury found Thetford guilty on all four charges. The evidence of Thetford's guilt on each count was overwhelming. To demonstrate why none of the grounds urged by Thetford merit a new trial and in anticipation of forthcoming pro se motions from Thetford challenging his conviction, this Court summarizes the facts in some detail now.

### B. Evidence at Jury Trial

#### 1. Thetford's Conduct and Events in South Dakota

##### a. Mysterious Visit of "Agent Russ" to South Dakota

On May 25, 2010, Thetford flew from Birmingham, Alabama, to Pierre, South Dakota, on Delta Airlines. Trial Exhibit 104. Thetford rented a gold Chevrolet Impala using a credit card for his business, Innovative Land Development, LLC, and listed his name on the rental agreement as Michael Heath, 156 Treymoor Drive, Alabaster, Alabama.[1] Trial Exhibit 105. Thetford stayed at the Capitol Inn and Suites in Pierre using his own name and again listing his 156 Treymoor Drive address. Trial Exhibit 106. Thetford was in South Dakota on May 28, 2010, Trial Exhibit 106, and flew back to Alabama on May 29, 2010, Trial Exhibit 104. Thetford told his friend Timothy Lewis, who transported Thetford to and from the Birmingham airport for this trip, that Thetford's intention was to go to South Dakota, pose as a federal agent, and convince a couple who had assets in Alabama not to return to Alabama. That couple, who

---

[1]Thetford's full name is Michael Heath Thetford. His address at the time was in fact 156 Treymoor Drive, Alabaster, Alabama.

3

expressed deep fear about being stalked and having their identity stolen, will be referred to in this Opinion and Order as Jack and Shirley.

On May 28, 2010, Jack and Shirley were living in a community outside of Pierre, South Dakota. Jack and Shirley previously had lived in Alabama, still owned a lake home near Shelby, Alabama, owned a building that Jack had used as a millwork shop in Bessemer, Alabama, and owned other property in Alabama including boats, airplanes, and jet skis. Jack and Shirley had purchased property in South Dakota in 1999, had built a home on the property, and had chosen around 2007 to stay permanently in South Dakota, although they had not abandoned their personal or real property in Alabama.

Thetford had an interest in aviation and learned that Jack and Shirley rented an airplane hangar in Alabama but were behind on payments. Thetford discovered that Jack and Shirley owned a lake house and business as well as airplanes. Thetford divulged to Lewis that he had gotten into the hangar, saw an airplane of Jack and Shirley's, and thought he could sell it. Thetford and Lewis twice went to Jack and Shirley's lake house and saw a boat and jet ski there.

On May 28, 2010, Thetford arrived in his rental car to the rural home of Jack and Shirley. Thetford was dressed in a suit and tie and was wearing sunglasses when he approached Jack and Shirley. Thetford had a gun in a holster on his hip, which was visible to Jack and Shirley. Jack and Shirley did not know Thetford. Thetford showed Jack and Shirley bogus FBI credentials and identified himself as either Agent Russ or Agent Russell. Shirley saw the FBI identification listing "Agent Russ" and also saw a United States Marine Corps identification in Thetford's wallet. Thetford never provided Jack and Shirley his real name, and both knew this person as

4

"Agent Russ."[2] Jack likewise saw the FBI identification and recognized, from Jack's experience as an amateur gunsmith, Thetford's gun as a Sig Sauer 226 model.

"Agent Russ" told Jack and Shirley that he was an FBI agent investigating them for money laundering and methamphetamine distribution. "Agent Russ" informed Jack and Shirley that their shop in Bessemer was being used to produce methamphetamine and questioned Jack whether he, as a licensed pilot, was transporting methamphetamine. "Agent Russ" said that Jack's brother Pete had "dirty hands." Jack and Shirley questioned whether "Agent Russ" was serious, and Thetford posing as "Agent Russ" became more assertive with Jack and Shirley.

"Agent Russ" revealed to Jack and Shirley that he knew a great deal about them and their Alabama assets. "Agent Russ" told Jack and Shirley that he wanted their computers and for them to come with him to the FBI office in Sioux City, Iowa,[3] to take a polygraph examination to clear their names. Jack and Shirley cooperated with "Agent Russ" believing him to be an FBI agent, collected their computers, and got into the backseat of a car that they variously described as being champagne or silver in color, consistent with the gold Chevrolet Impala that Thetford had rented upon his arrival in Pierre. "Agent Russ" referred to Jack and Shirley as "suspects." "Agent Russ" told Jack and Shirley that they were not being handcuffed out of courtesy, although he showed them that he had handcuffs at the ready. Jack and Shirley were very upset, scared, and tearful.

_____

[2]Much of this section comes from the testimony of Jack and Shirley, so "Agent Russ" will be used in place of Thetford in this part of the facts.

[3]Thetford likely meant Sioux Falls, South Dakota, rather than Sioux City, Iowa. Thetford was not familiar with South Dakota at the time of his visit. Sioux Falls is in the southeastern quadrant of South Dakota, while Sioux City is in the northeastern corner of Iowa, approximately eighty miles south of Sioux Falls. People not from the region occasionally confuse the two cities.

While driving toward Sioux City, "Agent Russ" engaged Jack and Shirley in discussions concerning his purported investigation, guns, and hunting. "Agent Russ" asked Jack and Shirley when they were last in Alabama and if they planned to return to Alabama. "Agent Russ" mentioned that his mother was Russian, that he had lived in Florida previously, and that he had a cat at his home.[4]

Before reaching Sioux Falls and within two hours of Sioux City, "Agent Russ" stopped the car at a gas station in Humboldt, South Dakota. "Agent Russ" then got out of the vehicle and appeared to Jack and Shirley to be on a cell phone call. Upon returning to the vehicle, "Agent Russ" told Jack and Shirley that he had good news, that they had been cleared, and that he would take them home. "Agent Russ," Jack, and Shirley stopped on the way back for dinner in Mitchell at a Ruby Tuesday restaurant. "Agent Russ" drank beer, even though he was posing as an FBI agent, which caused Jack and Shirley to question him. Jack and Shirley asked why, if he was from Sioux City, he had a Hughes County license plate.[5] "Agent Russ" explained that the FBI used such plates to blend in. "Agent Russ" paid for the dinner, with Jack and Shirley believing that "Agent Russ" used a credit card although later investigation revealed no credit card receipt from Ruby Tuesday that night that appears to correspond with the meal.

On the drive back, "Agent Russ" began talking about wanting to shoot jackrabbits and prairie dogs in South Dakota. Jack and Shirley directed "Agent Russ" to a prairie dog town near North Bend. Upon arriving back to Jack and Shirley's residence, "Agent Russ" let them out of the vehicle and allowed them to take their computers. Jack and Shirley noticed in the front of the

---

[4]During trial, testimony established that Thetford in fact had a cat and once lived in Florida. Thetford's mother may not have been Russian, but his ex-wife was from Latvia, a small country bordering Russia.

[5]In South Dakota, the first two digits of a license plate indicates the county, and Thetford's rental car had a South Dakota license plate beginning with "36" indicating Hughes County.

6

vehicle something referring to Kansas City on a road atlas. "Agent Russ" followed Jack and Shirley inside their home and talked about wanting the trigger of his gun to be lighter so that he might be able to shoot prairie dogs with it. "Agent Russ" gave his gun to Jack and asked Jack to see what he could do with the trigger. Jack immediately unloaded the gun and laid the clip down. "Agent Russ" then said that he would return under better circumstances for the gun and be in contact with them in the future.

### b. Jack and Shirley's Reports on "Agent Russ"

After "Agent Russ" left, Jack and Shirley were concerned about having the gun of an FBI agent in their possession. In the days that followed the mysterious visit of "Agent Russ," Jack and Shirley contacted the FBI offices in Sioux City and then in Kansas City about the visit from "Agent Russ." Neither the FBI office in Sioux City nor the one in Kansas City took seriously what must have seemed a bizarre report—FBI "Agent Russ" arriving near Pierre, transporting Jack and Shirley two-thirds of the way to Sioux City for a polygraph examination, turning around to take them back home, treating them to dinner and drinking beer during dinner, and leaving his gun with them.

On June 4, 2010, Jack and Shirley received an email message from "Gary Beck" at the email address cycle_wreck69@yahoo.com with the subject being "It's Russ." Trial Exhibit 107. The email uncorrected of spelling and grammatical errors stated:

> Hey Guys, it's Russ. Just finally found a little time to check in and let you guys know that we made an arrest. I can't give any more details at this time. I did put your names an on the victims compensation fund (like I said I would) if convicted, you will recieve a notice in the mail.
> Enough about work!!! I'm dying to get back to see you guys and do some shooting!
> How is everything? How are the dogs doing? Got to run. . . . get back to me when you get a chance.

Thanks,
Russ

Trial Exhibit 107. Jack and Shirley noted the unusual email address and did not know whether "Agent Russ" was an actual FBI agent.

In December of 2010, Jack and Shirley reported the encounter with "Agent Russ" to the South Dakota Division of Criminal Investigation (DCI) by calling Agent Brian Gortmaker. Jack and Shirley provided to Agent Gortmaker the gun, clip, and ammunition received from "Agent Russ" and forwarded the June 4, 2010 email. Agent Gortmaker asked the Bureau of Alcohol, Tobacco, and Firearms (ATF) to conduct a records search regarding the gun. The ATF was able to trace the gun to an Alabama gun shop, which had sold the gun in 2005 to David Hobbs. Agent Gortmaker found no information that the gun had been used in any crime and returned the gun to Jack and Shirley.

Gortmaker interviewed Hobbs who recalled (and so testified at trial) that he bought a Sig Sauer pistol, which he later traded to Mike "Thadford" for a small rifle after "Thadford" did some survey work for Hobbs. Hobbs knew the gentleman he recalled as being Mike "Thadford" from work and had seen him at a Birmingham gun show. At trial, Hobbs identified the Sig Sauer pistol[6] that Jack and Shirley ultimately provided to the FBI as the one that he had sold to the person he knew as Mike "Thadford."

Unsatisfied with DCI Agent Gortmaker returning the gun to them, Jack and Shirley then called the Minneapolis office of the FBI. The Pierre FBI office is within the Minneapolis region. FBI Special Agent Megan Breining, together with another Pierre FBI agent, interviewed Jack and Shirley separately. Jack and Shirley both were very skeptical initially that Agent Breining

---

[6]Hobbs was able to identify the particular pistol by the custom grips on the pistol that he had installed himself prior to trading it to Thetford.

and her fellow agent were in fact FBI agents.  Agent Breining collected the Sig Sauer pistol, clip, and ammunition.

Agent Breining received the lead from DCI Agent Gortmaker about a Mike "Thadford" having purchased the Sig Sauer pistol from David Hobbs.  Agent Breining learned that there was a Michael Heath Thetford, but no Mike Thadford in the area of Alabaster, Alabama, where Hobbs had sold the gun.  Agent Breining in time obtained the Delta flight records, the rental car records, and the lodging records showing that Thetford was in Pierre at the time "Agent Russ" visited Jack and Shirley.  Agent Breining attempted to find video surveillance from the places in Humboldt and Ruby Tuesday where "Agent Russ" had taken Jack and Shirley, but such video surveillance was unavailable and no receipt from Ruby Tuesday could be found for a credit charge by Thetford.  Agent Breining learned that Thetford had felony burglary convictions and a conviction for possessing a firearm with an altered identification.  Trial Exhibits 149–51.  Agent Breining sought and obtained a search warrant for Thetford's home at 156 Treymoor Drive, Alabaster, Alabama.

### 2. Findings in Search of Thetford's Home

The execution of the search warrant revealed a trove of material linking Thetford to a trip to South Dakota, to Jack and Shirley, and to other felonious activity in Alabama.  For starters, FBI agents found a Sig Sauer 226 box later identified at trial as being the box David Hobbs provided to Thetford with the Sig Sauer gun that ended up with Jack and Shirley in South Dakota.  Trial Exhibit 98.  The search uncovered handcuffs in a case, Trial Exhibit 95, and a gun holster for a pistol, Trial Exhibit 93D.

In a silver briefcase which Thetford in trial testimony admitted was his briefcase, the FBI found a fake FBI plastic identification with Thetford's picture bearing the name "Gary Beck,"

9

which was the name on the "It's Russ" email sent to Jack and Shirley. Trial Exhibit 83B. There were other badges bearing Thetford's picture but with the name "Gary Russell Beck." Trial Exhibits 87A–87B. Thetford in his trial testimony acknowledged that Gary Russell Beck was his friend when Thetford lived in Florida, but that Thetford had no ongoing relationship with Beck. The silver briefcase contained other fake identifications with Thetford's picture or with pictures of Timothy Lewis. Trial Exhibits 83D, 83G, 137B. The briefcase contained social security cards and miscellaneous papers from a Doug Mewbourne and an identification with the name of Craig Mewbourne but with Lewis's picture. Id. At trial, Craig Mewbourne testified that he is the son of Douglas Mewbourne, that the Mewbournes did not know Thetford or Lewis, and that Thetford had no reason to have identifications of himself or his father Douglas Mewbourne.

Thetford had in his home a number of documents that belonged to Jack and Shirley. Thetford had airplane logs and other records concerning Jack and Shirley's airplanes. Trial Exhibits 68, 81E. Thetford had records from Jack's millwork business, Trial Exhibit 81, other records from Jack, Trial Exhibits 81B, 82, Jack's identification from when he was a cadet with the Birmingham Police Department, and even an old family photo album belonging to Jack, Trial Exhibit 77. Thetford had a stack of Shirley's medical records. Trial Exhibit 79. Jack and Shirley had left behind these materials in their home and shop. Thetford had no right whatsoever to possess those records and had stolen them from Jack and Shirley's lake home and shop.

The FBI also found receipts in Thetford's home from his trip to Pierre. Trial Exhibit 81. Thetford had records of his felony convictions and a book concerning how to erase one's criminal background. Trial Exhibits 85, 91. Thetford had records from having been in the United States Marine Corps for one month. Trial Exhibit 85. Thetford also had a fake Marine Corps identification indicating an officer rank, despite never achieving that rank. Trial Exhibits

10

84, 147. Shirley at trial recognized the fake Marine Corps identification as similar to what she had seen in the billfold of "Agent Russ." A picture hung on the wall of Thetford in a United States Marine Corps uniform with a woman the FBI learned to be his ex-wife.

Thetford had been married to a woman named Iveta, but she had separated from Thetford in 2010, and had no involvement in the criminal activity. Iveta last lived at 156 Treymoor Drive in November of 2011, and then left it to Thetford. Iveta knew Thetford to use "Devil Dog" as his screen name on the computer. Iveta left with Thetford a pet special to Thetford, a Russian short-haired cat named Buddy.

The FBI also seized a computer owned by Thetford during the execution of the search warrant. That computer had a username of "Devil Dog," the username of Thetford. The computer contained, among many other things, pictures of Jack and Shirley's boat at Thetford's home, electronic versions of the fake identification cards bearing Thetford's or Lewis's photos, and records revealing how Thetford had captured electronically a signature of Jack and a signature of Shirley and had transposed those signatures repeatedly on document purporting to transfer Jack and Shirley's assets to Thetford or Thetford's business. Trial Exhibits 137A, 137B, 137C, 137D, 137E, 137F, 137G, 137H.[7]

Thetford had at his house various molds for making law enforcement badges and notary seals. Specifically, Thetford had notary seal molds for Ann Scholl, an Alabama notary public, and Brandy Boardman, a South Dakota notary public. Thetford had managed to capture electronically the signatures of Jack and Shirley and of Scholl and Boardman. Thetford then used the phony notary seals and lifted signatures to create documents whereby it appeared that Jack and Shirley were transferring property to Thetford or Thetford's business, Innovative Land

---

[7]The computer also contained images of child pornography. All mention of anything to do with child pornography was kept out of Thetford's jury trial.

Development, LLC. Both Scholl and Boardman testified that they had not notarized any such documents, that the seals on the documents were phony and not theirs, and that they had not given permission to anyone to copy their signatures or make and use false molds of their notary seals. Trial Exhibits 83A, 86A, 135, 138, 139, 140, 141. Shirley and Jack never transferred any assets to Thetford.

Thetford succeeded in using the phony documents to sell a boat owned by Jack and Shirley. Thetford had removed the boat from the lake home of Jack and Shirley, taken pictures of it in the driveway of the Treymoor Drive house, and then listed the boat on Craigslist. Michael Wilson, a complete stranger to Thetford, who was in the business of fixing and selling small boats, responded to the Craigslist advertisement. Thetford used the name "Jack" when dealing with Wilson. Thetford lied to Wilson saying that he needed funds because his wife was in the hospital and because he was an out-of-work airline pilot. Wilson felt sorry for "Jack." Thetford transported the boat to the parking lot of a Publix grocery store, and Wilson went there to view the boat. Wilson charged the battery, got the motor to run, set the boat on the side of the road with a "for sale" sign on it, and fielded calls about the boat. Ricky Howard saw the boat and expressed to Wilson interest in buying the boat and negotiated a purchase price for the boat with Wilson. Wilson met "Jack" at an Arby's restaurant near the Shelby medical center where "Jack" turned over a bill of sale. At trial, Wilson identified Thetford as the person posing at the Arby's as "Jack." Wilson then completed the sale of Jack and Shirley's boat for $2,800.00 to Howard, and turned the bulk of the money over to Thetford. Trial Exhibit 138.

### 3. Thetford's Activity With and Information from Lewis

Among the phony identification cards in Thetford's briefcase and elsewhere were Immigration and Customs Enforcement (ICE) credentials bearing pictures of Thetford and

12

Lewis, as well as an ICE badge mold. Trial Exhibit 83H. Thetford had in his house two ICE uniform shirts, Trial Exhibits 92, 93A, an ICE coat, Trial Exhibit 93B, and a hat emblazoned POLICE, Trial Exhibit 93C. Thetford had a fake identification card from United States Bail and Fugitive and authentic identification cards from resident aliens and other Hispanic people intermixed with fake identification cards bearing pictures of Thetford and Lewis. Trial Exhibit 88.

Based on the information seized, the FBI looked for and located Lewis, whose picture appeared on several of the false identification cards. Lewis cooperated with the FBI and divulged his relationship with Thetford and what Thetford was doing. Lewis had met Thetford in the mid-1990s, due to a shared interest in flying radio-controlled airplanes. The two of them became friends. Lewis knew that Thetford was a gun enthusiast, and indeed twenty-one different firearms were found by the FBI in the Treymoor Drive search. Thetford did surveying work under the name Innovative Land Development LLC, and Thetford hired Lewis to help.

In or around 2009 or 2010, Thetford raised with Lewis the idea of posing as federal agents to shake down illegal immigrants for money. Thetford explained that illegal immigrants tended to keep cash instead of having banking relationships, would be scared of ICE agents, and would not report ICE agents stealing from them out of fear of deportation. Thetford researched how to make artificial badges, made the molds, painted the badges in his basement bedroom, and got uniforms for both himself and Lewis. Thetford and Lewis took pictures of each other against a basement wall at Thetford's home. Thetford used those pictures to fabricate fake identification cards, including Thetford's fake FBI identification for Gary Russell Beck. The two of them dressed in short-sleeved uniform shirts that had "ICE" on them, with Thetford donning a pistol, flashlight, badge, and handcuffs and the hat that said POLICE. Thetford and Lewis then went to

areas where they thought illegal immigrants might live, waited for a Hispanic male to appear to be ducking away from them, followed the Hispanic male to an apartment, and entered the apartment claiming to be ICE agents executing a warrant. Lewis would gather and hold all of those present in a living room, while Thetford would go into the bedrooms and look for and steal jewelry, money, personal documents, prescriptions, and other documentation. Thetford rationalized this behavior to Lewis by asserting that illegal immigrants were taking tax money and it was their duty to take it back. Thetford and Lewis initially had success using this scheme, but later had some failures that frightened Lewis. Lewis pleaded quickly to a felony offense in Alabama based on this conduct.

Lewis's testimony about Thetford was confirmed in part by Thetford's friend Christopher Godber. Godber is a deputy sheriff in Alabama and had no involvement in Thetford's illegal activity. However, Godber knew Thetford liked aviation, was friends with Lewis, did land surveying, and was into computers and knew a lot about them. Once when in a Buffalo Wild Wings parking lot, Thetford showed Godber a fake law enforcement badge from the center console of his vehicle. Thetford described to Godber some wild ideas for getting money, such as targeting Mexican immigrants to rob. Thetford also said that Godber should join ICE. Godber did not take Thetford seriously, so Godber did not report these statements until he was interviewed by the FBI.

In 2010, Thetford became interested in Jack and Shirley. Thetford became aware that Jack and Shirley had an airplane in a hangar but were not paying rent and had quite a bit of real and personal property in Alabama not being supervised. Thetford took Lewis to the lake home of Jack and Shirley on two occasions. Lewis drove Thetford to the airport when he was flying to South Dakota to impersonate an FBI officer to get more information on Jack and Shirley. Lewis

used the computer at Thetford's home, but Thetford made the fake identification cards and had the interest in Jack and Shirley and their assets.

### 4. Thetford's Behavior Upon Learning of Arrest Warrant

Thetford learned that his house had been searched and an arrest warrant had issued for him. Thetford had in his possession a Lenovo laptop and wanted to keep the laptop away from the FBI. Thetford had met an individual named Mark Miller around 2011 on an airplane website. Thetford and Miller had spoken by phone, and Thetford had represented himself to Miller as being an aircraft designer and builder, which he was not. Miller had asked Thetford to build high-lift wings and paid Thetford $3,000, but never received any wings. On November 19, 2011, Miller went to Alabama to collect the wings and parts and to meet with Thetford. Rather than meeting at a shop as Miller expected to do, Thetford met Miller at a Waffle House, explained that he was getting a divorce (which was untrue as Thetford already had been divorced), and asked about coming to Florida to work with Miller on the wings. As their meeting was ending, Thetford put a computer within a bag in Miller's vehicle, together with other personal property. Trial Exhibit 102.

The FBI had been looking for Thetford after the November 16, 2011, search of the Treymoor Drive residence. On the same day that Thetford ditched his laptop and other material with Mark Miller, November 19, 2011, the FBI received information that Thetford's cat, Buddy, was to be delivered to Thetford at Confederate Memorial Park. FBI Special Agent Breining and FBI Special Agent Scott Keeler went to Confederate Memorial Park to intercept and arrest Thetford. Agent Keeler, who was driving, saw Thetford in a white truck, which then turned right to leave the park. Agent Breining was sitting beside Agent Keeler and was putting on a vest marked FBI at the time. Agent Keeler made eye contact with Thetford, watched the pickup in

15

his rearview mirror, and then turned around to follow the pickup. Thetford's vehicle pulled into a parking lot and stopped with the driver's door open. Agent Keeler parked the FBI vehicle in a way that obstructed Thetford's vehicle from backing away. Agent Breining spotted Thetford running from his vehicle. Agent Breining fell behind Agent Keeler as the two agents pursued Thetford on foot. Agent Keeler gave Thetford verbal commands, calling out "FBI," "Police," and Thetford's name, while giving Thetford instructions to stop running and that a warrant existed for his arrest. Thetford appeared to be tiring as he ran uphill. Ultimately, Thetford fell, went over a fence line, lost ground to Agent Keeler, and then fell again. Thetford remained noncompliant initially but ultimately got on his knees, raised his hands, and told the FBI agents to just shoot him. At trial, as was the case with much of Thetford's testimony, Thetford concocted a different version asserting that he thought he had thirty days to turn himself in on an arrest warrant and that, notwithstanding the instructions yelled at him by the FBI, Thetford purportedly did not believe those chasing him to be FBI agents.

### 5. Thetford's Behavior While In Custody

After being arrested, Thetford wrote to his sister, Heather Thetford-Meyer, on December 15, 2011, providing her instructions to retrieve the Lenovo laptop by tracking down Mark Miller. By this time, Thetford was in custody and wanted to bond out of custody. Thetford also wrote to his sister:

> I need money to go to Mexico. It's my only chance. I can come back in several years and start over with a new identity. . . . Do NOT tell anyone, and I mean anyone including dad about my plans to run. . . .
>
> My last ditch effort if I can't make bond is to defect. Please do some research for me on this subject and get mailing addresses for Russian, Ukraine, N. Korea or other communist countries embassy's [sic] . . . .
>
> . . . .

16

P.S. — Burn after reading — DO NOT KEEP THIS
LETTER

Trial Exhibit 132. Heather turned the letter over to the FBI. Trial Exhibit 132.

Based on the information in Thetford's letter to his sister, the FBI located Mark Miller,

served him with a subpoena, and obtained the Lenovo laptop. Trial Exhibits 102A, 102B, 102C.

The laptop bag included more fake identification cards with Thetford's likeness on them.

Further investigation on the Lenovo laptop revealed that it had accessed the internet through a

free wireless internet connection at a Panera Bread restaurant in Alabaster, Alabama. Near the

time the Lenovo computer accessed the internet through that restaurant's internet, the

cycle_wreck69@yahoo.com email account, from which the email from "Agent Russ" had been

sent to Jack and Shirley, had been logged into from an IP address associated with the same

Panera Bread restaurant. Investigators also found images and email communications on the

Lenovo laptop regarding the Craigslist sale of Jack and Shirley's boat. Email and Craigslist

correspondence involving the sale of the boat were also made from the IP address associated

with the same Panera Bread in Alabaster, Alabama.

While Thetford was in custody facing the charges in the Northern District of Alabama,

Thetford began to change his appearance by growing a beard, growing out his hair, and losing

weight. On February 13, 2013, Thetford sent to Jack a five-page letter. Trial Exhibit 131.

Thetford began the letter by stating that his intent was to discover evidence on behalf of the

defense and not to threaten or coerce Jack. However, the thrust of the letter belied those

statements. Thetford wrote to Jack, among other things:

> There are many discrepancies in the governments theories and
> evidence, and unfortunately the evidence and testimony that I plan
> to introduce could implicate you in criminal acts. At this hearing I
> will place a witness on the stand that will testify that Shirley has a
> prescription drug problem, I will also place a member of your

17

> family on the stand that will testify that you have a drinking
> problem. I will call other family members and people that know
> you here in Alabama and South Dakota that will testify about your
> character and the State of Alabama charges that were null
> processed, and why they were brought originally. I will put
> Shirley's ex-husband (who is a law enforcement officer) on the
> stand to testify . . . .

Trial Exhibit 131. The letter advised Jack that FBI agents were not his friends and would build a

case against Jack. Thetford then wrote: "If you and your wife are unable to identify me as the

alleged impersonator, based on the recent photograph (or in person) I will win the suppression

hearing and the case should be dismissed." Trial Exhibit 131. The letter urged handling of

matters in civil court and then stated: "With the federal government involved we all lose. I

would hate to see you and/or Shirley caught up in federal criminal charges." Trial Exhibit 131.

Toward the end of the letter, Thetford attempted to invoke sympathy for himself by writing:

> I may not survive this case, that is to say my life will end before
> the case does. This is very likely, and I have included a copy of
> my last filed document in this case. Please, PLEASE, take the
> time to completely read this document very carefully. If you are a
> patriot (and I believe you are) this is IMPORTANT information.
> Know that I refuse to submit to the tyranny of the Buero [sic] of
> Prisons, and I will die before that happens. In fact, I may not even
> live long enough to see any suppression hearing.

Trial Exhibit 131. Thetford also enclosed to Jack a sixteen-page pleading that he had

handwritten. Based on this letter, the jury found Thetford guilty of tampering with a witness.

Thetford pleaded guilty to certain of the charges in the Northern District of Alabama. As

a part of the guilty plea, Thetford agreed to the following facts:

> D. In May, 2010, THETFORD traveled to South
> Dakota, to the home of . . . "Jack"[8] . . . and Shirley . . . , and
> represented himself as an FBI agent, using a purported FBI
> credential. THETFORD identified himself as "Russ" or "Russell."
> THETFORD claimed to be engaged in investigating offenses

---

[8]This Court is deleting the last name of Jack and Shirley.

against the United States and sought information concerning alleged money laundering and drug trafficking offenses and sought to subject [Jack and Shirley] to a polygraph examination.

E.      [Jack and Shirley] accompanied THETFORD in a car driven by him to travel to the alleged polygraph examination. During the trip, THETFORD later told [Jack and Shirley] he'd gotten a phone call clearing them of the allegations. He then drove them back to their home in Pierre, dropped them off, and left.

F.      On or about June 4, 2010, THETFORD sent an email to [Jack and Shirley] from email address cycle_wreck69@yahoo.com. The email header contains the name Gary Beck, thus making it appear as if the email account belonged to "Gary Beck." The email stated, among other things and in substance, that an arrest had been made and that [Jack and Shirley's names] had been put on a victim's compensation fund. The email was signed "Thanks Russ."

G.      During execution of the search warrant at THETFORD's residence on November 16, 2011, FBI Agents recovered, among other items, authentic-appearing FBI and United States Marine Corps credentials in the name "Gary Russell Beck" and bearing THETFORD's photograph. Also found were items from which authentic appearing identification badges can be made, such as plastic cards and plastic laminate, and instructions on how to make identifications.

H.      On or about June 7, 2010, Shirley . . . replied by email, to the June 4, 2010, email described in paragraph F, stating in substance that she was glad an arrest had been made.

I.      On or about July 14, 2010, Shirley . . . emailed THETFORD at the email address described in paragraph F to report that a boat owned by [Jack and Shirley] in Alabama had been stolen. The email states: "my daughter just went to our house and someone has stolen my boat. Can you please help me out with this."

J.      [Jack and Shirley] owned a boat, Polar boat, hull # MJIJ4679I203. THETFORD did not own the boat and did [sic] have any right to sell it.

K.      THETFORD responded to this email on June 3, 2011, apologizing for the long delay in responding, claiming he had been with his Marine Reserve unit, and asking for various information regarding the boat in order to assist. The Yahoo IP address log for cycle_wreck69@yahoo.com reflects an IP address usage of 65.196.185.122 on June 3, 2011, at 1700 hrs GMT.

L.      Also on June 3, 2011, at 1732 hrs GMT, a boat identical to [Jack and Shirley's] was posted on Craigslist. Craigslist's servers are located in California and Arizona. The email address associated with the ad was rmaninla@yahoo.com

and the IP address associated with this post was 65.196.185.122, which was then assigned to the Panera Bread restaurant in Alabaster, located within Shelby County, Northern District of Alabama. The location of the seller was stated as Alabaster and the ad was signed by "Jack." The phone number given for Jack is 205-381-3286. This Tracfone phone number was registered to R.M., with email address rmaninla@yahoo.com.

M.    M.W.[9] saw the Craigslist ad, called the listed phone number and spoke with the boat seller, THETFORD, who posed as Jack. THETFORD said, among other things, that his wife was being treated at Shelby Baptist Hospital in Alabaster for a brain tumor and that he was selling his property to fund a trip to California for his wife for better medical treatment. M.W. looked at the boat, but didn't purchase it. Feeling bad for THETFORD, M.W. offered to help him sell the boat, eventually facilitating sale of the boat, hull # MJIJ4679I203, to R.H. for $2,800. R.H.[10] received a bill of sale for the boat bearing the forged signatures of [Jack and Shirley], which had been placed there by THETFORD using computer digital media.

N.    THETFORD used digital media seized from his home, and a laptop belonging to THETFORD, but recovered from M.M.,[11] to effectuate the above-described conduct.

Trial Exhibit 152.

## 6. Thetford's Case

This Court gave Thetford enormous latitude to present testimony from the ex-husbands of Shirley and the brother of Jack and others, all attacking Jack and Shirley's credibility. This Court also allowed Thetford to present testimony from his cellmate at the Hoover City Jail concerning the jail conditions there. Perry at 37. Thetford claimed that he had not voluntarily pleaded guilty, because he felt compelled to plead guilty to get out of poor conditions of confinement at the Hoover City Jail.

Thetford was aware that he had a felony, and indeed had copies of the convictions at his home, together with a book about how to erase one's criminal background. Trial Exhibits 81F,

---

[9]M.W. is Michael Wilson.
[10]R.H. is Ricky Howard.
[11]M.M. is Mark Miller.

85, 91. Thetford's sister testified that Thetford talked about wanting to do something about his felony convictions to get voting and gun rights back. This Court allowed Thetford to present testimony that he had been in the Marine Corps for one month, had been given a gun while at boot camp, and thereby believed himself entitled to possess guns. There is no question that the Sig Sauer pistol was a functioning firearm that had been transported in international and interstate commerce. Trial Exhibit 99.

Thetford took the stand and provided his story. Thetford acknowledged flying to South Dakota and meeting Jack and Shirley, but said that he had done work for Jack and Shirley in the past and that they know him. Thetford acknowledged having a fake FBI identification, but denied posing as an FBI officer. Thetford concocted a story that Jack and Shirley wanted to transfer their Alabama assets to him to be sold. Thetford admitted making phony documents to sell Jack and Shirley's boat, but doing so only after Jack and Shirley could not supply him needed records. Thetford claimed that Jack and Shirley mistakenly sent to him a box containing flight logs, Jack's family photo album, and Shirley's medical records, among other things. Thetford blamed Lewis for much of what was in Thetford's home or on his computers. For good reason, the jury did not believe Thetford, convicting him on all four counts.

## II. Discussion

### A. Legal Standard on New Trial Motion

Under Rule 33 of the Federal Rules of Criminal Procedure, this Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Granting a new trial under Rule 33 should occur "only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." United States v. Lacey, 219 F.3d 779, 783 (8th Cir. 2000) (quoting United States v. Brown, 956 F.2d 782, 786 (8th Cir. 1992)). Under precedent of

the United States Court of Appeals for the Eighth Circuit, the power of the court to grant a new

trial should be invoked only in an exceptional case where the evidence preponderates heavily

against the verdict. United States v. Starr, 533 F.3d 985, 999 (8th Cir. 2008). "As a general rule,

the decision whether to grant or deny a motion for a new trial lies within the discretion of the

district court." United States v. McMahan, 744 F.2d 647, 652 (8th Cir. 1984). Such authority,

however, "should be exercised sparingly and with caution." United States v. Cole, 537 F.3d 923,

926 (8th Cir. 2008) (citations omitted).

## B. First Motion for New Trial

Thetford's first motion for new trial asserts "newly discovered evidence" in that the

Eleventh Circuit reinstated Thetford's § 1983 lawsuit challenging conditions of confinement at

the Hoover City Jail. Doc. 149. The District Court had dismissed Thetford's § 1983 case after

Thetford failed to timely respond to a motion to dismiss. Thetford, through counsel, argues that

the reinstatement of his § 1983 case matters because this Court mentioned the dismissal for

failure to prosecute the claim as part of its Opinion and Order on the Government's Motions in

Limine in allowing the guilty pleas and related statements Thetford made into evidence. Doc.

149 at 2; see Doc. 102 at 12 n.4, 13.

The Eleventh Circuit reinstating Thetford's § 1983 case is not truly "newly discovered

evidence." It is a procedural development unrelated to whether Thetford's § 1983 case has

merit. The Eleventh Circuit simply chose to excuse Thetford's lapse in prosecuting the case.

Even so, Thetford cannot meet the standard for a new trial based on newly discovered

evidence, which the Eighth Circuit has stated as:

> To justify a new trial on this ground, (1) the evidence must have
> been discovered after trial; (2) the failure to discover this evidence
> must not be attributable to a lack of due diligence on the part of the
> movant; (3) the evidence must not be merely cumulative or

22

> impeaching; (4) the evidence must be material; and (5) the
> evidence must be likely to produce an acquittal if a new trial is
> granted.

United States v. Duke, 255 F.3d 656, 659 (8th Cir. 2001). Evidence of Thetford's § 1983 case
being reinstated plainly does not satisfy the fifth element of being likely to produce an acquittal
at a retrial. The Duke case demonstrates how high a standard this is. In Duke, the defendant,
who owned a St. Paul bar, and his brother, who managed the bar, were indicted for arson. They
were tried together, with the defendant convicted of arson and the brother convicted of
conspiracy to commit arson. The district court granted judgment of acquittal to the brother, and
the time elapsed for the government to appeal the judgment of acquittal. After the time elapsed
for the appeal, the brother wrote a letter to the district court stating that he alone committed the
arson and that the defendant knew nothing about the arson. The brother made similar statements
during a taped conversation. Notwithstanding all of this, and in large part because the district
court mistrusted the brother's veracity, the district court denied the motion for new trial, and the
Eighth Circuit affirmed.

In Thetford's case, as best as this Court can recall, there was no mention in front of the
jury of Thetford's § 1983 action challenging conditions at the Hoover City Jail being dismissed.
Rather, this Court allowed testimony from Thetford and Thetford's former cellmate, Gregory
Perry, about the conditions of the Hoover City Jail as a part of Thetford's theory that his plea
agreements in the Northern District of Alabama and admissions in connection with his guilty
pleas were not knowing and voluntary. The reinstatement by the Eleventh Circuit of Thetford's
§ 1983 case, essentially giving Thetford a do-over for failing to prosecute the § 1983 case, is not
material to Thetford's guilt or innocence and certainly is not evidence "likely to produce an
acquittal if a new trial is granted." See Duke, 255 F.3d at 659.

23

Even if Thetford's § 1983 case had been active at the time of this Court's ruling on Thetford's motion in limine, the ruling would have been the same. The dismissal of Thetford's § 1983 case, while worth noting, was not the sole justification for finding his Alabama pleas were made voluntary. Admitting evidence of Thetford's admissions in the Alabama plea agreements and at the change of plea hearing did not turn on the fact that his § 1983 case had been dismissed for failure to prosecute.

## C. Thetford's Pro Se Motions

Thetford, despite being represented by counsel, also filed a pro se motion for new trial. Doc. 152. Thetford makes various claims, including asserting that the Government has unlawfully engaged in targeting firearm offenses,[12] that Lewis should have been charged as his accomplice, that Jack and Shirley should have been presented with a suspect photo lineup, that certain facts allegedly were misrepresented to the Grand Jury and to the jury by Government witnesses, that his incarceration in Alabama "violated domestic and international legal obligations, rights, guarantees and immunities," that this Court's ruling admitting Thetford's admissions including his statements during his change of plea hearing in Alabama and portions of his plea agreement were mistaken, and that this Court should "restore the *status quo ante*, that is, re-establish the situation that existed before the detention of Defendant." Doc. 152.

This Court has issued an opinion and order previously explaining why certain of Thetford's admissions in connection with his plea agreement and change of plea hearing in the Northern District of Alabama were admissible at his jury trial. Doc. 102. There is no good

---

[12]Thetford previously filed a motion and ninety-three-page memorandum expressing his view that the Second Amendment entitles him to unfettered access to whatever guns he wants notwithstanding his felony convictions. Docs. 98, 99, 100. Thetford has very strong opinions and anti-government sentiments, which he can address to the Eighth Circuit on appeal if he wishes.

reason for this Court to revisit that ruling. This Court allowed testimony about conditions at the Hoover City Jail and how that may or may not have affected Thetford's entry into a plea agreement in the Northern District of Alabama and statements made in changing his plea, which included admissions relevant to the South Dakota charges. None of the grounds that Thetford raises in his pro se motion for a new trial justify relief.

Finally, Thetford has filed pro se a "motion for judicial notice of United Nations treatys [sic]," Doc. 151, and separately a notice of treaty law, Doc. 150. Thetford wants this Court to take judicial notice of certain aspects of international law that he claims are "controlling in interpretation and application of adjudicative facts in this case. Doc. 151 at 9. Thetford then argues that his treatment at the Hoover City Jail constituted violations of international law and torture.

The Supremacy Clause of the U.S. Constitution states that "Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land" notwithstanding the law of any state. U.S. Const. art. VI. However, "not all international law obligations automatically constitute binding federal law enforceable in United States courts." Medellín v. Texas, 552 U.S. 491, 504 (2008). Although treaties may be international commitments, they are only enforceable as domestic law if they are either self-executing or if Congress has enacted implementing legislation. Id. at 505–06; Whitney v. Robertson, 124 U.S. 190, 194 (1888). To determine whether a treaty is self-executing, a court must determine whether the treaty was intended to "operate[ ] of itself without the aid of any legislative provision" by the political branches that entered into the agreement—the executive branch and the Senate. See Medellín, 552 U.S. at 505 (quoting Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314 (1829)) (noting the requirement that a self-executing treaty "convey[ ] an intention that it be 'self-executing'" and be ratified on those terms

(quoting Igartua-De La Rosa v. United States, 417 F.3d 145, 150 (1st Cir. 2005) (en banc)); see also U.S. Const. art. II, § 2 (granting the President the power to enter into treaties with the "Advice and Consent" of the Senate).

Thetford asserts four international documents are international agreements that create domestic law binding upon federal courts: (1) the Compendium of United Nations Standards and Norms in Crime Prevention and Criminal Justice (Compendium of U.N. Standards); (2) the Convention Against Torture or Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT); (3) the International Covenant on Civil and Political Rights (ICCPR); and (4) the Charter of the United Nations (U.N. Charter). Doc. 151. These documents will be addressed in turn.

The Compendium of U.N. Standards is merely a collection of "best practices" that create a "collective vision of how criminal justice should be structured," and it does not represent a binding international document that has the force of domestic law in the United States or any other country. United Nations Office on Drugs and Crime, Introduction to Compendium of United Nations Standards and Norms in Crime Prevention and Criminal Justice, at vii (2006) available at http://www.unodc.org/unodc/en/justice-and-prison-reform/compendium.html. The collection is not a treaty, and the publication of the Compendium of U.N. Standards by the United Nations does not give it the force of a treaty, let alone domestic law. Therefore, Thetford's assertion that this publication creates rights that must be recognized by the Federal Bureau of Prisons or this Court is misguided.

The United States Senate approved a resolution of advice and consent to ratification of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment on October 27, 1990. 136 Cong. Rec. 36,198 (Oct. 27, 1990). The Senate provided consent subject to the following declaration: "That the United States declares that the provisions

26

of Articles 1 through 16 of the Convention are not self-executing."  Id.  Articles 1 through 16 are

the only provisions in the CAT that could be construed to create individual rights[13]—the

remaining Articles provide for the creation of a "Committee against Torture" and provide for

other necessary procedures.  This declaration clearly establishes that the CAT requires enacting

legislation to create domestic law, and Thetford has pointed to no such legislation implementing

the terms of the CAT as domestic law, nor is this Court aware of any such legislation.  Therefore,

the CAT is not a distinct source of legal rights beyond those granted to Thetford and all

defendants by federal law and the United States Constitution.  Of course, the Eighth Amendment

of the United States Constitution bars cruel and unusual punishment and thus outlaws conduct

that might be considered to be torture, but that is not Thetford's argument at this point.

The United States, with the advice and consent of the Senate, became a party to the

ICCPR on September 8, 1992.  U.S. Ratification of International Covenant on Civil and Political

Rights, 58 Fed. Reg. 45, 934 (Aug. 31, 1993).  The United States ratified the ICCPR with certain

reservations and declarations, including "[t]hat the United States considers itself bound by

Article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the

cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth

Amendments to the Constitution of the United States."  Id. at 45,941.  Further, the United States

declared: "[T]he provisions of Articles 1 through 27[14] of the Covenant are not self-executing."

Id. at 45,942.  "The Covenant obligates each State Party . . . to adopt any necessary legislative

measures" to give effect to the rights contained therein.  Id. at 45,934.  These declarations and

reservations clearly expresses political branch intent that the ICCPR is not self-executing, and

---

[13]All of violations of the CAT Thetford alleges fall under Articles 1 through 16.  Doc. 152-2.
[14]All of the violations of the ICCPR Thetford alleges fall under Articles 1 through 27 of the
ICCPR.  Doc. 152-2.

does not, on its own, create individual rights enforceable in federal courts beyond those granted by federal law or the United States Constitution.

Lastly, Thetford asserts that the United Nations Charter (U.N. Charter) creates domestic law that creates individually enforceable rights. This question was addressed by the Supreme Court in Medellín, 552 U.S. at 506. In Medellín, the Supreme Court noted that "the U.N. Charter reads like 'a compact between independent nations' that 'depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.'" Id. at 508–09 (quoting Head Money Cases, 112 U.S. 580, 598 (1884)). The Supreme Court went on to hold that the U.N. Charter does not provide for automatic domestic enforcement of decisions of the International Court of Justice (ICJ). Medellín, at 513–14. Just as the U.N. Charter does not make ICJ decisions self-executing, it does not make other documents or declarations of the United Nations self-executing. Therefore, the U.N. Charter does not grant Thetford individually enforceable rights beyond those granted to him by federal law or the United States Constitution.

Moreover, this Court heard testimony about the conditions of Thetford's confinement at the Hoover City Jail, both in a separate evidentiary hearing before trial and in testimony allowed at trial. Thetford's treatment falls far short of what would be considered torture, a violation of international law, or cruel and unusual punishment. Thetford received three meals per day, typically was held in a cell with a roommate, was allowed out of the cell for extended periods of time to a shared area with other inmates and had his medical needs attended. Thetford did not like the confinement, believed the prison to be overcrowded, and considered the prison to be the worst confinement conditions that he has experienced. The jury was allowed to hear testimony from Thetford and his former cellmate, Perry, about conditions at the Hoover City Jail, so

28

Thetford had a full opportunity to explain to the jury his experience there. Thetford was found guilty based on the abundant evidence against him.

Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of "adjudicative facts." Thetford seeks judicial notice of international law and treaties. "The Advisory Committee excluded 'judicial notice of law' from the scope of Rule 201 . . . [because] determination of law should be governed by rules of procedure, not by the Evidence Rules." 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5103.1, at 104 (2d ed. 2005). "Only Utah seems to think that 'law' is an 'adjudicative fact' that can be noticed under Rule 201." Id. at § 5103.1 at 115–16. Thetford can make arguments based on international law and treaties if he so wishes, but there is no good reasons for this Court to employ judicial notice under these circumstances.

## III. Conclusion

For good cause, it is hereby

ORDERED that Thetford's Motion for New Trial, Doc. 149; Pro Se Motion for a New Trial, Doc. 152; and Pro Se Motion for Judicial Notice, Doc. 151, are denied.

DATED this 31st day of December, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

29